As we know, just as a quick background, the Deepwater Horizon exploded, sank, and spilled over 200 million gallons of oil into the Gulf of Mexico, affecting the beaches and coastline from Texas to Florida. And, Counselor, so you can most effectively use your time, just so you know, we've all read the briefs and are familiar with the background. So this subset is the back-end litigation option plaintiffs. These particular set of plaintiffs result from the Master Settlement Agreement, and part of the Master Settlement Agreement, these plaintiffs are no different than the other beach workers who had specified physical conditions that were found by Judge Barbier through a fairness hearing. So these conditions, the same conditions that these below plaintiffs have, were the same conditions that were suffered by the SBCs, the people that were diagnosed or had their And as part of the Class Action Settlement, and as you know, this is general versus specific causation in this argument, our argument is, and we think that Judge Rogers wrongfully failed to apply the settlement itself to these plaintiffs, the settlement itself found these conditions were generally caused by the exposure to the oil and the corrective that was in there. Let me stop you there for just a moment. Didn't Judge Barbier construe his own, the settlement agreement that he approved, to require a general causation showing as well? No, the settlement agreement had, basically what the plaintiffs had to show is that it was already assumed that there was exposure for these below plaintiffs. And remember, part of the settlement was, this is after massive litigation, and the plaintiffs gave up their rights to punitive damages, even though there was a finding of egregious conduct on the part of BP. So as part of the settlement, these plaintiffs only had to show, because exposure was already given, that they had been exposed to it. That was a fact that did not have to be proven by these plaintiffs. The fact was, were they exposed to a sufficient amount of the oil and corrective to cause their condition? Which we argue is part of specific causation, that these plaintiffs had to show specifically what they were exposed to. I'm sorry, maybe I'm confused. I thought that Judge Barbier said that under the MSA's plain language, all below plaintiffs must establish causation without reference to the SPC matrix for, quote, the proof requirements found in the SPC matrix do not apply to below lawsuits, unquote. Isn't that what he said? Yes, ma'am, but we think they still should be able to rely upon these experts and their opinions in order for this court to have relied upon it. Can you just explain to me, are you saying that when he said that, he wasn't saying that the below plaintiffs had to prove general causation, or are you saying that you disagree with him that he was saying that the below plaintiffs had to prove general causation, but he was wrong? No, ma'am, I'm saying that I think the court should have taken into consideration these affidavits that allowed for the case to get settled. I'm sorry, I'm still a little confused. I'm just trying to figure out, because Judge Barbier is the one who approved the master settlement agreement, and so it's helpful to me to know what he thought it meant. And so it seems to me like he thought it meant that the below plaintiffs had to prove general causation, and what I'm not sure of is whether you're saying that I'm reading that decision wrong, and that he didn't say that the below plaintiffs had to prove general causation, or you think he was wrong, you're conceding that he said that the below plaintiffs had to prove general causation, but you think he was wrong because he neglected to review affidavits or take them into account. I think the distinction comes in is the actual, the language of the settlement agreement itself that was finally settled upon by the parties and accepted by the parties, and the language that was accepted upon is the plaintiffs only had to show they were exposed to a sufficient level of the corrective and the oils in order to prove causation. But just, I'm sorry, I just want to make sure I'm understanding. Do you agree that Judge Barbier said that the below plaintiffs had to prove general causation? Or do you disagree with that? I agree with that. Okay. All right. Thank you. All right. And so we feel that in order to prove that, that we should be able to rely upon the affidavits of the experts that were called upon to give their opinions. And these are experts that were hired by BP and by the Plaintiff's Steering Committee, and they gave the opinions that these conditions, these specific conditions that were suffered by the below plaintiffs, were caused by, can be caused by exposure to the oils. That's our basic argument there, that these are experts who studied this, who looked at it, and in order to get this case settled through a class fairness hearing, their opinions were relied upon. And I think those opinions should also be able to be available and relied upon by the below plaintiffs to prove general causation is my point, and I'll move on from that one. The second point is, we also had BP's expert, Dr. Shea, in this litigation for these plaintiffs admit under oath that these specific causations for these plaintiffs that we're talking about today, that their conditions can be caused by the exposure to the oil, the exposures they had. Now, his point was, I don't think they were exposed to enough oil to have caused it, which outputs us into the specific causation arena, the general causation, but he admitted... But did he testify to the dose relationship as to how much would cause those conditions? Yes, he said... And where can we find that in the record? It's in his definition testimony, and he said at levels where the EPA, it's the EPA levels of safe exposure, above that, these conditions can be caused by the exposure to the oil. Okay, but is there any evidence in the record that those amounts were prevalent in the areas where these two groups of below plaintiffs were? Which is the exact problem with the way this case was handled on general versus specific causation. We took it, and possibly a fault on my part, is we didn't get into the specific causation, how much they were exposed to, it was simply, can we establish that the oil and the corrective can cause these conditions? But what's important for general causation, not specific, and that's what Judge Ramos went off on several times saying, you didn't prove the exposures, you didn't prove the exposures, but we weren't tasked, and we shouldn't have been tasked according to 11th Circuit law, the McLean case, and other jurisprudence, with showing the specific causation to these workers. And even going back to the settlement, it's assumed they were exposed. The settlement says, we don't have to prove exposure, they were exposed. But doesn't, I mean, and again, I could be remembering this wrong, but I thought the magistrate judge had said that the way that it would work would be that there would have to be an expert report, I guess, or whatever, showing in the amounts to which these plaintiffs were exposed, meaning as a group. In other words, that if, for example, you have 20 plaintiffs, 20 plaintiffs in this particular class or whatever, and none of them were exposed for 20 days, and you need to be exposed for at least 20 days to have a sufficient dose relationship, then there would be no reason to go through specific causation on each one, because automatically none of them would be able to show it. And I thought that the plaintiffs agreed with that. So where the issue of fact arises from that is, what actually were the measurements that were done by the defense experts, whereas Dr. Williams relied upon her interviews of the plaintiffs themselves, they were exposed every day to the oil, they were exposed according to their testimony to planes flying over, dropping Correxit on them, they got the stuff in their eyes, they were breathing it in, they were smelling it, so that's their exposure every day. So there was evidence of exposure every day. And what we've shown is even with Dr. Shea's testimony that he said, and I think misled the court saying that these plaintiffs had actual badge data measurements that was taken on them as they worked. And in the way he wrote his report, it looked like there was actual bad data from these plaintiffs. When I cross-examined them, I got them to admit that that was false, that there was no actual bad data for these plaintiffs, that it was some surrogate person somewhere that he was relying upon to show that there was such minimal type of exposures. And I'm going to save my arrest for rebuttal. Thank you very much, Mr. Falcon. All right, we'll hear next from Mr. Hicks. Thank you, Your Honor, and may it please the court, George Hicks for the BP Appellees. Under Rule 702 and the principles established in Daubert and its progeny, a plaintiff bears the burden of demonstrating that his expert's opinion is both reliable and helpful. In a thorough 53-page opinion, Judge Rogers, who is overseeing hundreds of BELO cases and is thus intimately familiar with the facts and law surrounding the Deepwater Horizon incident, held that plaintiffs here had fallen, quote, woefully short of satisfying both of these requirements. And she thus excluded the general causation opinion of plaintiff's expert, Dr. Williams. That determination was correct, and it certainly was within the broad discretion and considerable leeway that district courts receive when making Daubert determinations. Counsel, can I ask you a question about something that Mr. Falcon said? He said that it was the plaintiff's position that they should be able to rely on the expert reports that were submitted in support of the SPC plaintiffs when they're trying to establish general causation. And I'd just like to hear your response to that. Your Honor, that is problematic for several reasons, as is the general argument that the MSA somehow established general causation for conditions that even though they were brought as LMPCs in the BELO litigation were listed in the SPC matrix. The first problem is that the text of the MSA, and I think my friend said that the settlement found that these conditions were caused by the substance. That is not true. The text of the MSA does not say anything about for conditions that are in the SPC matrix that there is any causation, that there is any stipulation, concession, or establishment of causation in any respect. So when you combine that with the fact that the settlement also says that for LMPCs brought in BELO litigation that the plaintiff must prove legal causation, which includes general causation, I think it's very clear that the text of the MSA itself still requires general causation even for conditions that are brought as LMPCs that might happen to be in the SPC matrix. So therefore, the plaintiffs then move to relying on some expert declarations. So if the master settlement agreement did not establish some type of causation, general causation, with respect to any of the SPC plaintiffs, what was it accomplishing? If you're talking about the SPC aspects of things, it was simply just a settlement mechanism to provide for some sort of compensation for a subset of plaintiffs who were diagnosed early with particular conditions, and then they didn't have to show causation. They just had to show, I think, a very minimal, something like a diagnosis from a doctor. But it's very different for all plaintiffs who were diagnosed after April 2012 and had to bring a BELO suit. There is absolutely general causation required there. And the MSA, critically, it's a contract. And it says that it has a merger clause, it has an integration clause, and it says that only the text of the MSA can be considered. So that's the first problem with going outside the four corners of the MSA and looking at these expert declarations to say that somehow they established general causation for the SPCs. But the second problem, if I can just complete the thought, is that if you look at those that were actually even considered by Judge Barbier in commenting on this in passing at the fairness hearing, but that declaration doesn't even talk about the levels of exposure or the duration of exposure or all the things that this court has repeatedly required to establish general causation in the McLean, Kilpatrick, Chapman cases. All the expert was saying was that assuming sufficiently high levels, these can cause it. But that's not sufficient general causation under this court's cases. So just to make sure I understand your response, the MSA basically did not say anything about causation one way or the other. It was just, you weren't admitting causation. You were just saying we're not going to contest that these plaintiffs who have, who contracted these conditions during this period and were in this location, are entitled to compensation. I think that's generally true. I don't even know if I'd go as far to say we wouldn't contest that, but it simply was not something that a plaintiff who was submitting a claim to the claims administrator, I mean the SPC process was so streamlined and didn't require much that it didn't even really go to the parties. It went to a claims administrator who just had to look at whether you submitted documents and that was pretty much it. So it's a completely and a very different process from the process set up for the back end litigation option. It's a litigation and you have to bring a suit in federal court and there are all sorts of requirements, one of which is legal causation and general causation. So I think that when you put together both the text of the MSA itself, which is really all that you can look at given the MSA, but then also what these declarations that they're going outside the text to rely on don't even themselves establish a general causation. Your Honor, as you said, Judge Barbier recognized all this and he emphatically rejected this very argument that is being made when it was made by a group of plaintiffs before him and he has continuing jurisdiction and enforcement of the MSA and so he knows the MSA better than anyone. He oversaw the negotiations, he oversaw the fairness hearing and when he was confronted with this argument, he emphatically rejected it for all the reasons that we've provided here. But of course, I mean, even though he is the judge who's overseeing it and one would expect he would understand what he meant when he approved it, it is a contract and we do need to construe the provisions of it de novo. I just ask sort of any persuasive effect that might have. That is correct, Your Honor. It is a contract. You apply traditional contract interpretation tools de novo, but as you said, I mean, he is very familiar with the background and everything that went into it and so I think that his comments at least about what might have, I mean, particularly if you're going to go outside the text of the MSA and get into negotiations and what happened during the fairness hearing and everything like that, at that point, I think almost you can take into account his own views of what happened, what was negotiated, what was intended, et cetera, et cetera. But again, I don't even think you have to get there given the plain text of the MSA itself. If I can move also to, and as I understand it, that was Plaintiff's initial argument here today, but I also want to talk about the second issue that they raised, which is about Dr. Shea admitting a general causation. As we point out in our brief and to no rebuttal by the plaintiffs, that's simply not the case. He wasn't, if you look at his testimony, he wasn't even talking about particulate matter or arsenic, which are the purportedly toxicological substances at issue in this case. He was simply discussing chemicals from the oil spill. He was talking about it at a very high level. It's almost similar to the declarations that went into the MSA. And as I said, under this Court's cases, McLean, Kilpatrick, Chapman, that's not enough. What you need to do is address, quote, how much must be used and for how long to increase the risk. And that's actually really the fatal problem. There are a number of problems, as Judge Rogers pointed out, with Dr. Williams' report, but one of the most pressing problems, and indeed fatal, is that she never identifies the level of particulate matter or arsenic that can cause these conditions at issue. If you look at her actual opinions, and one of them is, so she submitted two reports, they're largely identical, but I'll cite the Downs report because that covers both of the substances, and this is at Record, Volume 8, page 89. All she says there is that a cause-effect relationship exists between arsenic and chronic dermatitis. Next, a cause-effect relationship exists between particulate matter and chronic conjunctivitis, sinusitis, rhinositis, rhinosinusitis. And that's simply not enough under this Court's cases. You have to identify the level and the duration of the substance that can cause the condition because as this Court has said in the Chapman case, and is sort of common sense, every substance can potentially be toxic. So you have to identify some sort of level and duration. And as the plaintiffs admit at pages 21 and 22 of their brief, they say, Dr. Williams's reports do not devote any section to the dose-response relationship, and her reports do not provide any harmful levels either for particulate matter or arsenic associated with the development of the LMPCs at issue, the conditions at issue. So that is a fatal flaw right out of the gate. But as Judge Rogers identified, there are a number of other problems with Dr. Williams's opinion that make it completely unreliable and certainly within her discretion to exclude. Counsel, I think the parties misunderstood the standard of review in this case. They say the standard of review is the summary judgment standard, both sides, in their briefs. But this appeal involves two separate things. One is a bench trial under Daubert, a bench trial, at which time the Court decides whether or not the testimony is admissible. And in a bench trial, in Daubert, there are lots of subsidiary fact findings. Well, I'll back up. You abuse a discretion when a judge applies the wrong rule of law or applies it wrongly or two, because the fact findings leading to the discretionary call are clearly erroneous. Do you follow that? Yes, I agree. All right. Wait a minute. A lot of the arguments have to do in this case with the subsidiary fact findings the judge made antecedent to the Daubert ruling. And under Rule 104A of the Federal Rules of Evidence, that's not subject to summary judgment treatment. The judge makes the findings reviewable by clear error. You follow me? Not on whether there's a fact issue. So the argument about admissibility, and your colleague can bear that in mind, on the Daubert issue, all of her fact findings, or the judge's fact findings, that are subsidiary, none of those are clearly erroneous. And since none of those are clearly erroneous, and there's no argument that they are, and the judge properly applied the Daubert test, there can be no error, there can be no abuse of discretion. Then you move to summary judgment, and everybody agrees, or the plaintiff does anyway, as I understand it, that without that testimony, there is no case. That's correct, Honor. There's no dispute over that. But that's the second, basically the second appeal. There are two appeals within one appeal. Yes, Your Honor. There is the summary judgment aspect, and as you correctly point out, there's a dispute. That's a consequence of the bench trial on Daubert. Correct. Once the Dr. Williams' opinion was excluded under Daubert, there was essentially no basis not to grant summary judgment. All I'm saying is, and your colleague can bear it in mind, is all of the arguments made as to her subsidiary findings, when she's commenting on her other expert testimony, et cetera, you follow me? None of those are clearly erroneous. Yes, Your Honor. To the extent there's any fact-finding in her opinion, that would be subject, those found facts would be subject to a clear error review, and I don't read my friend or the court to make sure there's any clear error as to those findings, that's correct. My memory is that there was no evidentiary hearing as to the Daubert issue, is that accurate? There was a two-hour hearing that was all about Daubert. I mean, it was the summary judgment hearing, but because it was undisputed that everything rested on the admissibility of Dr. Williams' opinion, that entire two-hour hearing was all about Dr. Williams and the Daubert hearing. So it was essentially a Daubert hearing. Well, it was a Daubert hearing, but it was not an evidentiary hearing, as I recall. Dr. Williams... Isn't that one of the issues, that they're claiming that there was an abusive discretion not to hold an evidentiary hearing on a Daubert motion in a case of this magnitude? Well, that is, I believe, the plaintiff's last argument, but number one, they told Judge Rogers that she didn't even have to conduct a hearing, an evidentiary hearing, so I think they forfeited the issue, but also, it's also within the broad discretion of a district court to decide how to make the Daubert determination, and this court even held in the Cook case where there was an event hearing, that that wasn't an abusive discretion. So I think that to not conduct a hearing that happened to have Dr. Williams as a witness, given that, as Judge Rogers found, she had already submitted two reports and undertaken two depositions, and the record was voluminous, that that was well within Judge Rogers' discretion. Again, after being told by the plaintiff that she didn't even have to have a hearing. Mr. Hicks, my understanding for Daubert purposes is that the parties proffered, basically, proffered evidence. Oh, absolutely. There was plenty of evidence. You had depositions, you had reports of all sorts of things. Absolutely. There was plenty of evidence, and that's what Judge Rogers said. She said the record is voluminous, there's not going to be anything marginally added by having her speak at the hearing, whereas the lawyers spent two hours debating these very issues. And if there are no other questions. All right. Thank you, Mr. Hicks. I think we have your argument. Mr. Falcon, you've reserved five minutes. Kind of work backwards. Judge Steele, this is exactly what happened in this case. We moved for a hearing, live testimony of the experts that we could fully explain this very complicated scientific basis of this report, and we were denied it. In fact, we only had a telephone hearing. It wasn't live. It was over the telephone, and we had to rely upon deposition testimony from Dr. Williams, whereas, as was pointed out in the Padilla's case that we cited, you know, these are the type of cases where the experts need to be in front of the judge. The judge can express their concerns, and the experts can address those concerns. Dr. Williams had a 50-, 60-page report. She had all the issues that are in there. She had, you know, even if you talk about the dose response, there was an ant study that was in there. That was rejected because it dealt with a study in Louisiana, but it showed general causation. So, we do feel that we were prejudiced by not having that hearing, and there would have been a difference. The Cook case involved one plaintiff who killed himself in jail, and that's what was cited by Judge Rogers for not giving us the hearing. The other case that Judge Rogers relied upon, the Billify, that was dealing with a drug that caused some problems to the people. There were four days of hearing in that case where Judge Rogers rolled on. We thought that we should have been able to have that opportunity. Can I ask you a question about that? You said that you felt like you were prejudiced by not having a hearing, and what do you think would have come out differently if you had had a hearing? In other words, I'm asking what the prejudice is. Dr. Williams would have explained, as in her report, you know, in reports you don't always cover everything in a report. It's not required. You have to give your general base of your opinions, and once you get the opinions, then you come and testify like I'll always have from my experts, is you explain your report in front of the judge in the live testimony. So, she would have explained that she did have a dose response. She would explain how she would have applied this epidemiology. It was there. She cited so many different cases. I think more importantly, to the point, she would explain how the mechanism of the injury, which is important, the biological plausibility in this case, where we have known exposures already given from the settlement, we have exposure. You have her interviewing these plaintiffs, saying they're getting this oil on them every day. They're getting stuff in their eyes. They're breathing it. And then she talked about how does this mechanically cause these injuries. Can I ask you something about that? She did give a deposition, and she was asked questions. I thought she was asked questions about her report, and she declined to explain them and said, I'm not going to give you a bunch of gobbledygook. And so, why is that? Why would it be, why would we expect that she would give a different answer later? And even if she did give a different answer, I mean, is that appropriate to not have an answer in the deposition, and then? Judge, take that one question out of probably 12 hours of deposition testimony is really a red herring. Because for 12 hours, she explained herself, and she answered questions. And she went back and explained, really, this mechanism of injury, which is very important in this case. You have a direct insult, physical insult, and she explained it. And they haven't questioned that at all. They've never questioned that. So, what more would we have expected to see her to have explained if there were a hearing than she did not explain during the deposition? I think one of the biggest things that would have been worked out is, where's general causation stop, and where does specific causation begin? I think that's where some of the confusion came in, in this case. And a lot of her testimony, and even with Judge Rogers' opinion, is you didn't explain how much they were exposed to. You didn't explain how exposed to. And that's not part of general causation. That's general causation. Can the oil cause these problems? But isn't that a legal issue as to what is considered general causation versus what is considered specific causation? It's a legal issue, but it's also, when you break it up like this, you start with, let's prove general causation, then we'll go to specific. But as a legal issue, where does one start, where does one stop? I think in this case, we had enough evidence to prove the general causation. And going back to the declarations made by BP's own experts. First, Dr. Hurstine, she said in her declaration, oil and dispersants could cause the conditions listed in the matrix, assuming exposure to sufficient levels. And there's nowhere that BP's argued or anybody else argued that we were precluded from using these declarations. These declarations are part of the record. They're part of a massive litigation. They were used as a fairness hearing. And even though we can't rely upon a finding, there's nothing precluding us from using that declaration. Because BP's own expert admits these conditions are generally caused by the exposure to the oil. As did Dr. Shea in his deposition. Specifically, these conditions were explained in some test I'm asking you about right now. Are these conditions caused by exposure to this oil? Yes. But I don't think they were exposed to enough of it. That's where general starts, and that's where specific starts. I respectfully ask that you reverse their opinion. Thank you very much, Mr. Falkin. Thank you. Thank you.